# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM H. WHITEHEAD as power of attorney for LEWIS E. WHITEHEAD, JR. pursuant to a power of attorney signed by WILLIAM E. WHITEHEAD, JR., <br><br> Plaintiffs, <br><br> v. <br><br> BBVA COMPASS BANK, and JAMES C. PUCKETT. <br><br> Defendants, | C.A. No.: 01-CV-2018-_____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

COMES WILLIAM H. WHITEHEAD, by and through his undersigned attorney of record, and states as follows:

## I.
## PARTIES

1.     The Plaintiff, WILLIAM H. WHITEHEAD ("WILLIAM"), is a resident citizen of Alabama who was appointed as power of attorney by and for his father, LEWIS E. WHITEHEAD, JR. ("LEWIS"), and appears as Plaintiff in this case representing Lewis as his power of attorney.  WILLIAM H. WHITEHEAD is an adult above the age of 19 and is a citizen of Jefferson County, Alabama.

1

2.     The Plaintiff, LEWIS E. WHITEHEAD, JR. ("LEWIS"), is a resident citizen of Alabama and is an adult above the age of 19 who has resided for many years in Jefferson County, Alabama.

3.     The Defendant, BBVA COMPASS BANK ("COMPASS") is a banking corporation with its principal place of business located in Nashville, Tennessee and which does business in Birmingham, Alabama. It is a commercial bank in the business, among other things, of selling and managing financial investments.

4.     The Defendant, JAMES C. PUCKETT ("PUCKETT"), was at all times relevant to this case a senior vice president of Compass, and was assigned by Compass as the investment officer of that organization responsible for and in control of the investment account of LEWIS at COMPASS. Mr. Puckett was at all relevant times a resident of the State of Alabama.

## II.
## JURISDICTION

5.     This Court has jurisdiction of this action under § 10(b)(5) of the 1934 Securities Act pursuant to the provisions of 28 U.S.C. § 1331 which provides that the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties, of the United States. The Court also has jurisdiction of the claims and civil actions herein as arising under the Constitution

and laws of the State of Alabama under the Court's ancillary and/or supplemental jurisdiction under the provisions of 28 U.S.C. § 1367.

## III.
## FACTS

6. On November 23, 2016, Compass, acting as the broker for an on behalf of Plaintiffs informed William Whitehead ("William"), the power of attorney for his father, Lewis E. Whitehead, Jr. ("Lewis"), by a written sale notice, that it had sold Bank of the West CDs which it had earlier bought for $450,000.00 for Lewis. William was unaware of the sale of these securities. William did not know of or approve the sale in any way. The sale resulted in a loss of $38,000 in the principal. There was no benefit to Lewis from the sale. In addition, there were broker charges by Compass in the approximate amount of $80,000,00. The sale was contrary to William's instructions to Defendants. These funds had been purchased on April 29, 2015 by Compass for Lewis. William gave instructions to the Defendants that no investments should be made or sold by them for Lewis that were not short term or in which any principal or capital was at risk. Defendants agreed to follow these instructions, but did not.

7. William, acting for and on behalf of Lewis, repeatedly instructed Defendants that the preservation and safety of the principal and capital was their objective and earnings were not a significant objective. Lewis had investments at five Birmingham banks during this 2016-2017 period when he appointed William

power of attorney.  William wanted to reduce the number of these banks to two. He told the Defendants Compass that they would be one of the banks if they followed instructions.  This was agreed to by Defendants.

8.     William and Defendants Compass and Puckett agreed that they would act in all matters for Lewis pursuant to a general power of attorney Lewis gave to William.  The Defendants and William agreed that William could and would rely on their investment advice to accomplish William's stated primary investment goal for his father, Lewis, preservation of principal.  Defendants agreed they would abide by and follow William's instructions on this investment goal, and would not depart from this goal without William's express consent and agreement.  It was on this basis and this basis alone that William agreed to do business for Lewis with Compass as stockbroker.  The investment goal was to be absolute safety of the principal and, secondarily only, a reasonable return on the investments.

9.     At the beginning of the relationship, Lewis had the following investments at Compass a savings account in the amount of $116,146.00; a CD for $200,000.00; and another CD for $250,000.00.  William and the Defendants agreed that Defendant Puckett would be the only person at Compass buying or selling investments for Lewis and that Defendant Puckett would obtain William's consent and agreement before doing either.

4

10. Defendant Compass in the course of the ongoing investment relationship with William on behalf of Lewis purchased $450,000.00 of Bank of the West CDs. These CDs were unsuitable investments for Lewis and their purchase was contrary to the instructions given by William. The CDs paid a guaranteed interest rate of .75%, but could pay up to 7% depending on the performance of a "basket" of five common stocks named by the Bank of the West. The CD did not convey any interest in the stocks. Defendants bought these CDs although they knew that the CDs provided for a substantive loss of principal if they were sold before maturity. The maturity was seven years from the purchase and Defendants had no reason to believe they would be held that long. Defendant Puckett concealed this information from William in order to obtain a substantial commission for buying and selling the CDs. This was prohibited "churning" of the investment. In absolute violation of the orders given by William regarding preserving the safety of the principal, any sale of the CDs prior to their seven year maturity would result in a substantial loss of principal. Although Defendant Puckett discussed the purchase of the Bank of the West CDs with William, he was not told of the risk factors involved in the purchase of the CDs even though most of them were published in the Offering Circular for the CDs published by the offeror, Bank of the West. Even though a part of the offering circular was given to

William, that part advising of the risk factors was concealed by the Defendants from William.

11. Defendants fraudulently bought and sold the Bank of the West CDs to William for Lewis so they could obtain very large commissions off the purchase and sale. The Defendants earned a fee for purchasing the CDs then for selling them, and finally for purchasing other securities to replace the CDs. Defendants sold the CDs without the knowledge or consent of William or Lewis although the Defendants knew that by selling the CDs $38,000.00 of the principal would be lost. No principal would be lost if the CDs were held to maturity. The only reason for the sale by the Defendants was the commissions earned by Defendants. If the CDs were held to maturity there would be no loss of principal and the CDs would earn a minimal annual interest rate of .75%. The sale was made by Defendants as an intentional and deliberate fraud on William and Lewis in order for Defendants to earn a commission.

12. The CDs were advertised by Bank of the West as Seven Year Income Advantage Market-Linked Certificates of Deposit linked to an equity basket of five stocks with annual interest payment due on April 28, 2023. The documents published by the Bank of the West describing these certificates of deposit, the Offering Circular, stated that, "Purchasing the CDs involves a number of risks, see 'risk factors' in the Disclosure Statement and 'additional risk factors' in this

Supplement."  Beginning on page S-5 of the Offering Circular, the issuer of the CDs provided the following warnings, all of which were intentionally concealed from Williams and Lewis by the Defendants (Exhibit A):

> [These] CDs involve certain risks. Purchasing a CD is not equivalent to investing directly in any one or more of the Reference Shares. In addition, your purchase of a CD entails other risks not associated with an investment in conventional bank deposits. The CDs may not be appropriate for you. <u>You should carefully review the terms in the "Key Risks" and "Additional Risk Factors" set forth below and in the "Risk Factors" beginning on page 4 of the accompanying Disclosure Statement before you decide that a CD is suitable for you. We urge you to consult your investment, legal, tax, accounting and other advisers before you purchase a CD</u>. *(emphasis added)*.
>
> ### KEY RISKS
> - <u>The CDs are designed to be held to maturity and you do not have the right to withdraw your funds before then, except in the case of death or adjudication of incompetence. You should not purchase our CDs unless you plan to hold them to maturity</u>. *(emphasis added)*.
> - No secondary market is expected to develop for the CDs. Your CDs will not be listed on any securities exchange or included in any interdealer market quotation system. As a result, there may be little or no secondary market for your CDs. <u>The price, if any, at which a broker or any other potential buyer may be willing to purchase CDs from you in secondary market transactions will likely be lower than the issue price, and any sale prior to maturity could result in a substantial loss to you and you may receive less than your Deposit Amount</u>. *(emphasis added)*.
> - <u>The deposit is a liability of the Bank and, to the extent in excess of the limits of deposit insurance, is subject to the Bank's creditworthiness and may be lost on insolvency of the Bank. Any accounts or deposits you maintain directly with the Bank in the same right and capacity as you maintain your CDs would be aggregated with such CDs for purposes of calculating insurance coverage limits.</u>

7

- <u>FDIC coverage limits apply in the event of an insolvency of the Bank. As described in more detail in the accompanying Disclosure Statement, the FDIC standard maximum deposit insurance amount is $250,000 per depositor per insured bank</u>. *(emphasis added)*.
- The Interest Rate on the CDs may never exceed the Minimum Interest Rate and will be subject to a cap. Therefore, the return on your investment in the CDs may be less than the amount that would be paid on a conventional CD or other bank deposit issued by us with a similar maturity.
- <u>The issue price of each CD of $1,000 includes certain costs that are borne by you. Because of these costs, the estimated value of the CDs on the Pricing Date will be less than the Deposit Amount</u>. The costs included in the issue price relate to selling, structuring, hedging and issuing the CDs, as well as to the Bank's funding considerations for certificates of deposit of this type. (Please see Estimated Value of the CDs on page 2 of the Disclosure Statement for more information). *(emphasis added)*. (See Exhibit A at 5-5).

13. The issuer also added the following Additional Risks Factors resulting from the purchase of the Bank of the West Certificates of Deposit (Exhibit A):

### ADDITIONAL RISK FACTORS

a) You will have no ownership rights in the Reference Shares.

b) We are not affiliates of the issuers of the Reference Shares.

c) Any Interest Rate in excess of the Minimum Interest Rate will be based on the performance of the Reference Shares.

d) Future performance of the Reference Shares cannot be predicted based on actual historical performance.

e) Calculation of the amount of the Interest Rate on your CD will not take into account fluctuations in the prices of the Reference Shares over time.

f) The Reference Shares may be highly concentrated in one or more geographic regions, industries or economic sectors.

g) Correlation (or lack of correlation) of performances among the Reference Shares may reduce the performance of the CDs.

h) The Interest Payments on the CDs may be based in part on the performance of the common stock of a company other than the issuers of the Reference Shares, or on factors other than Closing Price pertaining to a Reference Share.

i) The inclusion of non-U.S. issuers of Reference Shares involves risks associated with the home country of the issuers.

j) Regulation of global capital markets and trading platforms is uncertain and may change in a way that adversely affects the value of the Reference Shares.

k) The estimated value of the CDs set forth on the cover page of this Supplement is not an indication of the price, if any, at which you may be able to sell the CDs after issuance.

l) We or our affiliates, including BNP Paribas, BNP Paribas Securities and BancWest Investment Services, Inc. ("BWIS"), may have economic interests adverse to the holders of the CDs. (See Exhibit A at 5-5 through 5-8).

14. All of these "Risk Factors" were contrary to the investment instructions William gave to the Defendants which Defendants agreed to follow as a condition of their handling Lewis' account. Defendants deliberately concealed these "Risk Factors" from William in order to fraudulently induce him to agree to buy the CDs for Lewis.

15. In fact, no explanation of any risks to capital associated with these CDs were ever made to William by the Defendants. However, in July of 2017, Defendants Compass and Puckett advised William after the fact that the CDs had

been sold by them at a loss of $38,000.00 for $412,000.00 on November 23, 2016. William was unaware prior to July of 2017 the sale had taken place or any principal had been lost.

16. Although the Defendant Puckett had agreed that he would personally be in charge of the Lewis Whitehead account and would personally approve all transactions after consultation with William, he did not do so on the sale of these CDs.

## IV.
## CAUSES OF ACTION

### COUNT ONE
**Claims Under Rule 10b-5 And § 10(b) Of The Securities Exchange Act of 1934**

17. Plaintiffs adopt and reincorporate all prior allegations as if fully set forth herein.

18. This count is brought as a securities action for damages and violations of §§ 10(b), 15(c)(1), and 15A of the Securities Exchange Act of 1934; S.E.C. Rule 10b-5, 15c1-2; NASD Rules of Fair Practice art. III § 2; and NYSE Rules 405(a), (2).

19. The breaches of fiduciary duties of the Defendants are "in connection with" securities sales within the meaning of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2000), if

the securities transactions and breaches of fiduciary duty coincide. (*SEC v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)).

20. Defendants acting as stockbrokers for Plaintiffs had a fiduciary duty to Plaintiffs.

21. Any distinction between Defendants' omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to his clients. Defendants' silence in connection with the purchase or sale of the Bank of the West CDs operated as a fraud actionable under § 10(b) because there was a duty to disclose arising from the relationship of trust and confidence between Defendants and Plaintiffs which Defendants violated and proximately caused Plaintiffs' loss.

22. Congress barred deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face-to-face. (*Id*. at 820)

23. Section 10(b) should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes. (*Id*.at 819)

24. Rule 10b-5 and § 10(b) (jointly referred to hereinafter as § 10(b)) of the Securities Exchange Act of 1934) makes it unlawful for brokers to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive devise or contrivance in contravention of such rules and regulations as

11

the [SEC] may prescribe." 15 U.S.C. §78j(b). A "security" is defined broadly to include, among other things, stocks, bonds, debentures, a variety of other investments, or, "in general, any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(a)(10). A stockbroker is a person that has customers and engages in the business of effecting transactions and securities. Defendants used in connection with the purchase and sale of the CDs manipulative and deceptive devises and contrivances resulting in damages to Plaintiffs.

25. Where Plaintiffs' request for punitive damages is based on state claims, state law controls their request.

26. Defendants, by virtue of their position as stockbrokers to the Plaintiffs, owed a fiduciary duty to the Plaintiffs. Defendants fraudulently breached this duty as a broker and his employer and their breach of fiduciary duties renders them liable to the Plaintiffs in damages. New York Stock Exchange ("NYSE") Rule 405 provides that every member organization is required, through a principal executive officer or a person or persons designated under the provisions of NYSE Rule 342(b)(1) to use due diligence to learn the essential facts relative to every customer, every order, and every person holding power of attorney over any account accepted or carried by such organization to supervise diligently all accounts handled by registered representatives of the organization. Defendants

breached this rule and are liable to Plaintiffs in damages for that breach and the losses caused by it.

27. If the Defendants did not investigate the CDs of the Bank of the West, they were required to, but did not disclose that fact to the Plaintiffs and warn them of the risks of making investments without full knowledge; the Defendants must have satisfied themselves that not only the security but also the type of transaction in buying and selling is suitable for the Plaintiffs. The security and the types of transactions were not suitable for Plaintiffs and Defendants knew they were not.

28. To satisfy good faith, requirements, Defendants must show that the controlling person, Compass, maintains a reasonable and proper system of supervision and internal control over controlled persons so as to prevent as far as possible violation of § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Plaintiffs allege that Defendants did not maintain such supervision and internal control and as a proximate conscience of such behavior caused financial loss to Plaintiffs.

29. Defendants acted with scienter by making representations to the Plaintiffs with willful and reckless disregard for their truth and he acted with a knowing disregard for the requirements § 10b-5.

30. Defendants are liable to Plaintiffs under the common law principle of respondeat superior. *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973).

31.   An act in violation of Rule 10b-5 was committed by Defendants because they made an untrue statement of a material fact and omitted to state material facts where that omission would make what was said misleading.  A fact or omission is material if the disclosure of the omitted fact or correction of the misstated fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.  Reckless disregard of the truth is sufficient to establish scienter.  Defendants were in violation of Rule 10b-5 and § 10(b) and are liable in damages to the Plaintiffs.

32.   The SEC's implementing regulations, § 10(b) and Rule 10b-5, further defines the scope of the statutory language. The Rule renders it unlawful, in connection with the purchase or sale of any security, to:

(a)   Employ any device, scheme, or artifice to defraud;

(b)   Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading; or

(c)   Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

33.   Although the statute does not provide for an express private right of action to enforce Section 10(b) and Rule 10b-5, one has been implied since the mid-1940s.

34. Defendants are liable in damages to Plaintiffs because liability under Section 10(b):

(a) The Defendants made a material misstatement or omission;

(b) The misstatements or omissions were made with scienter because they intended to deceive, manipulate or defraud the Plaintiffs;

(c) There is a connection between the Defendants misrepresentations or omissions and the Plaintiffs' purchase or sale of a security;

(d) The Plaintiffs relied on the misstatement or omission;

(e) The Plaintiffs suffered economic loss; and

(f) There is a causal connection between the material misrepresentations or omissions of the Defendants and the Plaintiffs' loss.

35. It is well-settled that a private action under Section 10(b) can be brought by a purchaser or seller of the security. 15 U.S.C. § 78j(b). *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730–31 (1975).

WHEREFORE, the Plaintiffs claim of the Defendants compensatory damages in the amount of $100,000.00 for the said violation of § 10(b)(5).

### STATE LAW CAUSES OF ACTION

### COUNT TWO
### Negligence And Compensatory Damages

36. Plaintiffs adopt and reincorporate all prior allegations as if fully set forth herein.

37. The Defendants negligently caused injuries and damages to the Plaintiffs by failing to exercise reasonable care under the circumstances in informing the Plaintiffs of the risk factors listed in the offering circular of the Bank of the West concerning the Bank of the West Certificates of Deposit, failed to advise the Plaintiffs of the potential loss of capital if the CDs were sold prior to maturity, failed to follow the Plaintiffs' instructions as to the types of securities the Plaintiffs would allow the Defendants to purchase on the Plaintiffs behalf, and failed to use reasonable care in purchasing suitable securities for Lewis.

38. Plaintiffs contend that as a proximate cause of the said negligence of the Defendants, that as a proximate result of the aforesaid negligence of the Defendants, the Plaintiffs were caused to lose a large portion of the capital invested in the said securities.

39. Plaintiffs claim of the Defendants compensatory damages in the amount of $100,000.00 as a proximate result of the said negligence of the Defendants.

WHEREFORE, Plaintiffs pray that the Court will award them compensatory damages in the amount of $100,000.00 and $1 million in punitive damages.

## COUNT THREE
## Breach of Fiduciary Duty

40. Plaintiffs adopt and reincorporate all prior allegations as if fully set forth herein.

41. The Defendants were acting as stockbrokers for the Plaintiffs and as such, had a fiduciary duty to the Plaintiffs.

42. The fraudulent breach, by a broker and his employer, of their fiduciary duties renders them liable to the investor in punitive and compensatory damages.

43. Although the Defendants were informed of the risk factors involved for the Plaintiffs if the Bank of the West CDs were purchased for the Plaintiffs, the Defendants deliberately concealed the said risk factors from the Plaintiffs, omitted to provide the Plaintiffs with a copy of the offering circular of the Bank of the West for the said CDs, and fraudulently and deliberately deceived the Plaintiffs with regard to the contents of the offering circular by providing the Plaintiffs with only a part of the offering circular which part did not include the issuer's description of the risk factors.

44. The Defendants had a fiduciary duty to the Plaintiffs to select suitable investments for the Plaintiffs based on the instructions that the Plaintiffs had given to the Defendants for the securities to be purchased for the account of Lewis. Among these instructions was the instruction that the principal was not to be put at risk.

45. The Defendants breached this fiduciary duty by deliberately investing in unsuitable securities for Lewis' account.

46. In direct violation of these instructions and their fiduciary duty to follow them, the Defendants deliberately and fraudulently purchased the Bank of the West CDs which were both unsuitable and which purchase did not follow the instructions given to the Defendants by the Plaintiffs.

47. The elements of a breach of fiduciary duty claim are the existence of a fiduciary duty, a breach of that duty, and damage suffered as a result. (*Aliant Bank v. Four Star Investments, Inc.*, 2017 Ala. LEXIS 75, 14 (2017)).

WHEREFORE, Plaintiffs claim compensatory damages in the amount of $100,000.00 and punitive damages in the amount of $1 million plus attorney's fees and costs of court.

## COUNT FOUR
### Suppression

48. Plaintiffs adopt and reincorporate all prior allegations as if fully set forth herein.

49. The elements of a suppression claim are a duty on the part of the Defendants to disclose facts, concealment or nondisclosure for material facts by the Defendants, inducement of the Plaintiffs to act, and action by the Plaintiffs to their injury.

50. The Plaintiffs aver that the Defendants had a duty to disclose the fact that the Bank of the West CDs were not a suitable purchase for Lewis under the instructions given to the Defendants given by William regarding investments on

behalf of Lewis because the principal of the investment was at risk if the investment were sold prior to maturity, there was no FDIC insurance of the said principal.  The securities were sold by Defendants without informing William or Lewis of the sale resulting in a loss of $68,000.00 plus associated costs which loss would not have been incurred if the securities had been held to maturity.  The account was unnecessarily "churned" to generate unnecessary brokerage fees for the Defendants.

WHEREFORE, the Plaintiffs claim damages of the Defendants in the amount of $100,000.00 compensatory damages, and $1 million in punitive damages for the said suppression of material facts.

## COUNT FIVE
## Fraud

51. Plaintiffs adopt and reincorporate all prior allegations as if fully set forth herein.

52. The elements of a fraud claim are a false representation concerning a material fact, reliance upon the false representation and damage as a proximate result.  All of these elements are present in Plaintiffs claims against Defendants.

53. Defendant Puckett discussed the purchase of the Bank of the West CDs prior to their purchase for Lewis' account.  Defendant Puckett engaged in multiple misrepresentations and omissions concerning the Bank of the West CDs.

WHEREFORE, Plaintiffs' claim of the Defendants the sum of $100,000.00 for compensatory damages and $1 million in punitive damages.

    Respectfully submitted,

    */s/William Eugene Rutledge* (RUT001)
    Attorney for the Plaintiff

**OF COUNSEL**:
THE RUTLEDGE LAW FIRM, LLC
Two Chase Corporate Dive
Suite 460 Birmingham, AL 35244
205-985-2411
williamerutledge@aol.com

## JURY DEMAND

PLAINTIFFS DEMAND A STRUCK JURY FOR THE TRIAL OF THIS CAUSE.

    */s/William Eugene Rutledge* (RUT001)
    Attorney for the Plaintiff

**SERVE DEFENDANTS BY CERTIFIED MAIL**

BBVA Compass Financial Corporation
Registered Agent:  B.S. Clanton
15 South 20th Street
Birmingham, Alabama 35233

James Puckett, Jr., Senior Vice President
BBVA Compass Global Wealth
Daniel Building
15 South 20th Street, Suite 804
Birmingham, Alabama 35233